1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  | SAN DIEGO COUNTY CREDIT          Case No.:  18cv967-GPC(MSB)
    | UNION,

12  |                                  **MEMORANDUM DECISION AND**
    |                        Plaintiff, **ORDER FOR ENTRY OF**

13  |                                  **JUDGMENT**
    | v.

14  |
    | CITIZENS EQUITY FIRST CREDIT

15  | UNION,

16  |                       Defendant.

17

18        Plaintiff San Diego County Credit Union ("SDCCU") brings this action for

19  declaratory judgment of invalidity of Defendant Citizens Equity First Credit Union

20  ("CEFCU")'s common law mark, IT'S NOT A BANK. BETTER.[1]  (Dkt. No. 139, SAC

21  ¶¶ 88-96.)  A bench trial was held via ZOOM on March 30, 2021 and April 1, 2021.

22  (Dkt. Nos. 335, 338.)  Martin Bader, Esq. and Jesse Salen, Esq. appeared on behalf of

23

24  _____

25  [1] The fourth cause of action for declaratory judgment of invalidity claim for the common law mark is the
    remaining claim in the second amended complaint ("SAC").  The other causes of action that were ruled

26  on at summary judgment or dismissed by joint motion were: 1) declaratory judgment of noninfringement
    of CEFCU. NOT A BANK. BETTER.; 2) declaratory judgment of noninfringement of NOT A BANK.

27  BETTER.; 3) declaratory judgment of invalidity of CEFCU. NOT A BANK. BETTER; and 4) false or
    fraudulent trademark registration under 15 U.S.C. § 1120, (Dkt. No. 139, SAC), as well as CEFCU's

28  counterclaim for trademark cancellation, (Dkt. No. 141).  (Dkt. Nos. 256, 259, 276.)

SDCCU and James Dabney, Esq. appeared on behalf of CEFCU.  (*Id.*)  On April 7, 2021, CEFCU filed its closing argument, SDDCU filed its closing argument on April 13, 2021, and CEFCU filed a reply closing argument on April 15, 2021.  (Dkt. Nos. 343, 347, 350.)

Having carefully reviewed the evidence and the arguments of the parties, as presented at trial, and in their written submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule ("Rule") of Civil Procedure 52(a) and finds in favor of SDCCU seeking declaratory judgment that NOT A BANK. BETTER. is invalid.[2]

### FINDINGS OF FACT[3]

SDCCU is a credit union organized and existing under the laws of the State of California, having its principal place of business and headquarters in San Diego, California and CEFCU is a credit union organized and existing under the laws of the State of Illinois, having its principal place of business and headquarters in Peoria, Illinois. (Dkt. No. 303, Stip. Facts ¶¶ 3, 4.)

---

[2] After the close of Defendant's case in chief, both parties orally moved for judgment on partial findings under Rule 52(c), which the Court took under submission.  (Dkt. No. 348 at 275-76; *see also* Dkt. No. 349 at 31, 162.)  The Court also noted this was a "big-ticket" legal issue that the parties would be briefing when they submit their written closing argument briefs.  (Dkt. No. 348 at 275.)  CEFCU's counsel acknowledged he would brief the issue in writing.  (Dkt. No. 349 at 162.)  Despite raising Rule 52 motions, neither party addresses their Rule 52(c) motions in the closing briefs.  (*See* Dkt. Nos. 343, 347, 350.) Therefore, the parties have either abandoned or waived their Rule 52(c) motions and the Court declines to consider them.  *See e.g., Kohler v. Inter–Tel Tech*s., 244 F.3d 1167, 1182 (9th Cir. 2001) (observing that issues raised in an appellate brief but not supported by argument are deemed abandoned); *Am. Int'l Enters., Inc. v. FDIC*, 3 F.3d 1263, 1266 n. 5 (9th Cir. 1993) (issues raised in briefs that are not supported by argument are deemed abandoned).

[3] The parties filed letter briefs to address the appropriate procedure for providing the Court with transcripts of deposition video clips played at trial to impeach a witness.  (Dkt. Nos. 342, 345.)  SDCCU argues that Exhibits 195 and 196 that were lodged with the Court consisting of transcript excerpts from deposition video clips played by SDCCU at trial to impeach CEFCU's witnesses Jennifer Flexer and On Amir, (Dkt. No. 334), should be admitted as evidence in order to make a complete record.  (Dkt. No. 342.)  SDCCU does not explain why the transcripts need to be admitted rather than lodged with the Court to be considered part of the record.  CEFCU argues that because the transcripts have been lodged, they should be treated as if the court reporter had transcribed the deposition audio as it were played in open court during trial. (Dkt. No. 345.)  Because Exhibits 195 and 196 have been lodged with the Court, they are considered part of the record.

On September 1, 2010, CEFCU filed an application to federally register CEFCU. NOT A BANK. BETTER. on the principal trademark register.  (Trial Ex. B.)  On May 3, 2011, the United States Patent and Trademark Office ("USPTO") recorded U.S. Registration No. 3,952,993 for CEFCU. NOT A BANK. BETTER. in standard characters (the "'993 Registration").  (Trial Ex. A.)  The USPTO recorded the '993 Registration without requiring any disclaimer[4] of NOT A BANK. BETTER.  (Trial Ex. B.)

At trial, Jennifer Flexer, CEFCU's Assistant Vice President of Market Strategy and Analytics, who has been employed with CEFCU since 1997, was the sole non-expert witness to testify.  (Dkt. No. 348, Flexer Test. at 78:21-79:1.)  From 2006 to 2011, CEFCU used "Your Credit Union" as its primary tagline on its advertising.  (Dkt. No. 348, Flexer Test. at 150:11-19; *see also* Trial Exs. 21, J, 33,[5] 95.)  In 2011, CEFCU made a corporate decision to rebrand and switched its tagline from "CEFCU, Your Credit Union" to "CEFCU. NOT A BANK. BETTER."  (Dkt. No. 348, Flexer Test. at 151:8-16.)  It is not disputed that since 2011, Defendant has consistently used NOT A BANK. BETTER. with its housemark, CEFCU, in the form of CEFCU. NOT A BANK. BETTER. in its extensive advertising and marketing.  (Dkt. No. 349, Trial Trans. at 283:12-19: *see also* Trial Exs. C, D.)

Prior to its corporate decision to rebrand in 2011, CEFCU used the tagline or slogan, NOT A BANK. BETTER. as part of its advertising and marketing beginning in 2006.  (Dkt. No. 348, Flexer Test. at 91:4-8.)  On September 20, 2006, CEFCU, in an internal email, announced it would start the "Not a Bank. Better." campaign to include TV, radio and billboard ads for its fall membership campaign that would run in Illinois for a period of four weeks.  (Dkt. No. 348, Flexer Test. at 81:23-82:3; 83:3-18; Trial Exs. F, G.)  This campaign included 15-second TV ads promoting CEFCU and in a closing

---

[4] "The Director may require the applicant to disclaim an unregistrable component of a mark otherwise registrable. An applicant may voluntarily disclaim a component of a mark sought to be registered."  15 U.S.C. § 1056(a).

[5] Trial Exs. J and 33 are duplicative.

graphic where floating type moves across the screen "Not a bank. Better." along with the CEFCU housemark are displayed.  (Trial Exs. G-2, G-5.)

On October 16, 2006, CEFCU first used NOT A BANK. BETTER, by itself and separate from the housemark CEFCU in an ad that ran for one day in the Decatur Herald and Review.  (Trial Ex. CC - 4645-47.)  The rectangular advertisement presents "Not a Bank. Better!" in the upper left-hand corner and on the bottom right-hand corner is CEFCU's former tagline, "CEFCU Your Credit Union."  (*Id.*)

CEFCU's first use of CEFCU. NOT A BANK. BETTER. was in a print advertisement in the Peoria Journal Star on February 5, 2007 promoting its home equity loans.  (Dkt. No. 348, Flexer Test. at 168:15-169:19; Trial Exs. I, J.)  The ad features "CEFCU. Not a bank. Better" in normal text after a description of its home equity loan and its former tagline highlighted in the bottom right-hand corner, "CEFCU Your Credit Union."  (Trial Exs. I, J.)

In 2007, CEFCU's website landing page[6] displayed at the bottom, "Contact CEFCU or visit a Member Center to find out more about the credit union difference. CEFCU… Not a bank. Better."  (Dkt. No. 348, Flexer Test. at 119:2-121:1: Trial Exs. K, L.)

In October 2007, CEFCU mailed out a newsletter to members over sixteen years old.  (Trial Ex. M.)  NOT A BANK. BETTER. was used twice in the text of the Chairman's letter.  (Trial Ex. M-2.)  The Chairman wrote, "The phrase, '*Not a Bank – Better'* certainly described those early days" and "'*Not a Bank—Better*.' It still holds true today."  (*Id.*)

In November 2007, CEFCU produced a storyboard for a 15 second TV ad promoting its Visa credit card.  (Dkt. No. 348, Flexer Test. at 125:1-12.)  On the last shot, the CEFCU logo appeared and then "Not a bank. Better." rained down and was placed

---

[6] A landing page is a web page where a web visitor ends up on by clicking on a CEFCU display ad on a third-party website.  (Dkt. No. 348, Flexer Test. at 120:16-121:1.)

under the CEFCU logo.  (Trial Ex. CC-4535.)  This ad was aired from time to time between 2007 and 2010 when the Visa credit card offer was being promoted.  (Dkt. No. 348, Flexer Test. at 126:2-5.)

CEFCU also played two audio radio advertisements at trial.  The first radio ad began running in the fall of 2007 until 2010.  (Dkt. No. 348, Flexer Test. at 105:8-13; 126:18-23; 127:6-9.)  In the closing remarks promoting CEFCU's Platinum Rewards Visa card, the announcer states, "Switch to Visa Rewards from CEFCU.  Not a bank. Better."  There is a slight one second pause between "CEFCU" and "Not a bank. Better." (Trial Ex. CC-4497.)

The second radio ad began to run in the spring of 2008 until 2010.  (Dkt. No. 348, Flexer Trans. at 128:2-8.)  In the closing of the second radio ad promoting CEFCU's home equity line of credit, the announcer states, "Call . . . or stop in for details for a home equity loan from CEFCU. Not a bank. Better."  (Trial Ex. CC-4498.)  In this ad, there is no pause between CEFCU and NOT A BANK. BETTER.  (*Id.*)

In a storyboard for a 15 second TV ad, which aired in 2008 to 2010, promoting CEFCU's offer to pay closing costs for first-time home buyers, Flexer testified that there was a time delay between when the word CEFCU appeared and "Not a bank. Better" appeared on the last slate.  (Dkt. No. 348, Flexer Test. at 129:12-23; 130:3-14; Trial Exs. 4557 and 4559.)

Starting February 1, 2008 for a period two months, CEFCU used the tagline, NOT A BANK. BETTER., by itself, along with its former tagline, "CEFCU. Your Credit Union," in its pocket schedules.  (Trial Ex. CC-4510.)

In 2009, CEFCU ran a home equity campaign.  (Dkt. No. 348, Flexer Test. at 132:21-133:6, 136:10-18; Trial Ex. O; *see also* Trial Ex. P.)  CEFCU published newspaper ads promoting its home equity loan with CEFCU NOT A BANK. BETTER. in regular text and font and used its former tagline "CEFCU Your Credit Union" which was highlighted in the bottom right corner.  (Dkt. No. 348, Flexer Test. at 133:7-10; Trial Ex. O-2.)  This promotion included radio ads using CEFCU. . . NOT A BANK.

BETTER.  (Dkt. No. 348, Flexer Test. at 133:15-24; Trial Ex. O-3.)  The promotion also included TV ads that included a slate at closing displaying CEFCU. NOT A BANK. BETTER.  (Dkt. No. 348, Flexer Test. at 134:3-17; Trial Ex. O-4, O-5.)  Flexer testified there was a time delay between display of the word CEFCU and NOT A BANK. BETTER. in the TV ad.  (Dkt. No. 348, Flexer Test. at 134:18-20.)

In August 2009, CEFCU sent credit card statements to about 50,000 of its credit card holders.  (Dkt. No. 348, Flexer Test. at 137:12-17; Trial Ex. Q.)  The credit card statements included an ad for a car loan with CEFCU. NOT A BANK. BETTER along with "CEFCU Your Credit Union."  (Trial Ex. Q.)  These ads were inserted in the statements about five times between 2009 and 2011.  (Dkt. No. 348, Flexer Test. at 137:12-15.)

On December 31, 2008, CEFCU purchased Valley Credit Union in northern California.  (*Id.* at 161:13-19.)  In the Spring 2010, CEFCU ran an ad in Scene, a magazine from the East Bay area for Valley Credit Union, a division of CEFCU.  (Dkt. No. 348, Flexer Test. at 137:22-138:17; Trial Ex. R.)  "Valley Credit Union, a division of CEFCU" is above the tagline "NOT A BANK. BETTER."  (Trial Ex. R-4.)  A fourth quarter 2010 Valley Credit Union newsletter was sent to CEFCU members who were members of the former Valley Credit Union in October 2010.  (Dkt. No. 348, Flexer Test. at 138:18-139:1; Trial Ex. S.)  The newsletter promoted the CEFCU Visa card and included, "Enjoy a better value and switch to a Visa Credit Card from CEFCU. Not a bank. *Better*."  (Trial Ex. S-1.)

Because CEFCU had no recognition or meaning outside of central Illinois, and the words "credit" and "union" have some negative connotations, CEFCU decided to rebrand itself around 2010-2011.  (Dkt. No. 348, Flexer Test. at 151:17-152:12; 161:20-162:5.)  CEFCU wanted to convey from a marketing standpoint that it was a full-service financial institution.  (*Id.* at 162:6-10.)  At this time, CEFCU also decided to register CEFCU. NOT A BANK. BETTER. as a trademark because that is how they had been using the phrase and wanted to continue using them together.  (*Id.* at 156:7-13.)  Ms. Flexer

testified that use of NOT A BANK. BETTER. was always a part of its branding and marketing of CEFCU and has had a powerful impact. (*Id.* at 119:10-120:9.)

In 2011 and again in 2017, CEFCU issued detailed brand guidelines concerning use of CEFCU. NOT A BANK. BETTER which includes its housemark, CEFCU, and the tagline, NOT A BANK. BETTER.  Since 2011, CEFCU consistently used the following as its tagline in the following format below or in a horizontal format, (*id.* at 202:3-21; Trial Ex. 42 at p. 4).



These brand guidelines have been strictly complied with in all advertising and marketing since 2011 in order to keep a consistent brand.  (Dkt. No. 348, Flexer Test. at 197:11-17; *see also* Trial Exs. 26, C, D.)  Except for variations in color, CEFCU did not allow the logo to be altered in any manner and the tagline was never to be displayed by itself.  (Dkt. No. 348, Flexer Test. at 197:20-199:5; 202:22-203:3.)

However, since rebranding, there were two instances where NOT A BANK. BETTER. was used by itself.  First in 2011, CEFCU created standard design business cards with NOT A BANK. BETTER., by itself, in white text on a blue background on the back side of the cards.  (Dkt. No. 348, Flexer Test. at 123:11-13; Trial Ex. C-13.)  From 2011 to the present, CEFCU printed and distributed about 1.1 million of the business cards to employees.  (Dkt. No. 348, Flexer Test. at 122:18-23; 123:4-7; 207:8-9; 209:11-21; Trial Ex. C-13.)  The front side of the card has the logo "CEFCU. Not a bank. Better." as well as the address and contact information of a CEFCU employee.  (Dkt. No. 348, Flexer Test. at 206:10-12; Trial Ex. C-13.)  CEFCU employees distribute the business cards in the course of networking and working throughout the communities that

1  they serve.  (Dkt. No. 348, Flexer Test. at 218:24-219:5.)  Flexer testified that the
2  business cards were used in advertising and marketing of CEFCU services.  (*Id.* at 123:8-
3  10.)  However, Ms. Flexer did not know how many of the 1.1 million have been
4  distributed to customers or potential customers.  (*Id.* at 210:2-5.)

5      Second, the current landing page of CEFCU's website was originally posted on
6  August 1, 2017 and displays "Not a bank. Better." in the center highlighted in white on
7  top of a picture, by itself, without the housemark.  (Dkt. No. 348, Flexer Test. at 121:6-
8  22; Trial Ex. DD.)  The bottom of the page also displays CEFCU. NOT A BANK.
9  BETTER.  (Trial Ex. DD.)

10              **CONCLUSIONS OF LAW**

11      SDCCU's fourth cause of action seeks to have a declaration finding that CEFCU
12  does not hold a protectable interest in the tagline NOT A BANK. BETTER on four
13  grounds of which two were pursued at trial: (1) CEFCU has not continuously used the
14  tagline in commerce with credit union services as a standalone mark apart from the house
15  mark "CEFCU" and (2) the tagline is merely descriptive and is not protectable.  (Dkt. No.
16  139, SAC ¶¶ 100, 102.)

17  **A.    Continuous Use of NOT A BANK. BETTER.**

18      **1.    Burden of Persuasion**

19      The function of the Declaratory Judgment Act is "procedural" and substantive
20  rights remain unchanged.  *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S.
21  191, 194 (2014).  The burden of proof is a substantive aspect of a claim.  *Id.*  In this case,
22  under the common law, there is no presumption of validity of the subject mark.  As such,
23  to establish validity, the initial burden falls on CEFCU to demonstrate ownership of the
24  common law mark and then the burden shifts to SDCCU to demonstrate that it is invalid.
25  *Cf. Vuitton Et Fils S.A. v. J. Young Enters., Inc*., 644 F.2d 769, 775 (9th Cir. 1981)
26  ("under the Lanham Act, registration and entry of a trademark . . . shifts the burden of
27  proof from the plaintiff, who would have to establish his right to exclusive use in a

28

common law infringement action, to the defendant, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such protected use.")

The Court concludes that CEFCU bears the burden of persuasion to show that it had made continuous use of the tagline to create a valid mark.[7]  CEFCU is not entitled to any presumption of validity and, as a practical matter, it is in a superior position to demonstrate its ongoing use of the mark rather than requiring SDCCU to prove a negative.  *Cf. Medtronic*, 571 U.S. at 200 (patent holder in a better position than an alleged infringer to know, and to be able to point out, just where, how, and why a product infringes a claim of that patent and until he does so, alleged infringer may have to work in the dark).  Accordingly, on the remaining claim for declaratory relief of invalidity, CEFCU must establish that it has a valid and protectable ownership interest in the tagline, NOT A BANK. BETTER., distinct from its ownership rights in its registered trademark, CEFCU. NOT A BANK. BETTER.

### 2.  Applicable Law

Next, the Court must decide what law to apply in analyzing the legal issues before it.  CEFCU submits that Illinois state law, not Ninth Circuit law, applies relying on *Jim Mullen Charitable Fdn. v. World Ability Fed'n*, 917 N.E. 2d 1098, 1105 (Ill. App. Ct. 2009).  The Court agrees that Illinois law provides the starting point in identifying the applicable law for determining whether CEFCU's use of its tagline has established an ownership right for the common law mark.[8]  In *Jim Mullen*, a trademark infringement case, the Illinois court of appeals observed that "because the [trademark] statutes themselves neither create a valid trademark nor establish new rights, courts may apply a

---

[7] The Court previously arrived at this conclusion during the motions in limine hearing.  (Dkt. No. 348, Trial. Trans. at 32:4-40:2.)

[8] While the evidence at trial showed that the tagline was used in Illinois and California, CEFCU does not contend that it acquired a valid trademark right under California law.  If it did, there was no evidence that the use of the tagline had gained independent trademark significance in California.  Instead, CEFCU's case was centered on offering evidence to demonstrate that it acquired a trademark right under Illinois law.  (*See, e.g.*, ECF No. 331 at ¶ 87.)

single analysis to federal, state, and common law trademark claims." *Id*. at 1104; *see also Bedrock Mgmt., Inc. v. Peoples Choice Entm't, Inc*., No. 14–cv–06624, 2014 WL 4979270, at *2 (N.D. Ill. Oct. 6, 2014) ("Illinois statutory and common law trademark claims are examined under the same analysis as federal trademark claims."); *Eagle Forum v. Phyllis Schlafly's American Eagles*, 451 F. Supp. 3d 910, 919 (S.D. Ill. 2020) ("The elements of a claim for Illinois common law trademark infringement are the same as under [Lanham Act § 43(a)]"); *cf. Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 425 (1916) (common law of the several states has the same origin for the most part, and their law concerning trademarks and unfair competition is the same in its general features).

Here, CEFCU argues that SDCCU's continuous and standalone use theory under Ninth Circuit law is irrelevant and has no basis in law or fact. (Dkt. No. 350 at 6.[9])  In its papers, CEFCU relies on *Jim Mullen* for the general proposition of trademark law that one may obtain protectable rights in a slogan if it is used in sale or advertising or services and is "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."  (Dkt. No. 350 at 6 (citing *Jim Mullen Charitable Fdn*., 917 N.E. 2d at 1108).)  Ninth Circuit law also applies the same standard.  *See Rearden LLC v. Rearden Commerce, Inc*., 683 F.3d 1190, 1205 (9th Cir. 2012) (quoting *New W. Corp. v. NYM Co. of Cal*., 595 F.2d 1194, 1200 (9th Cir. 1979) (whether the mark was used "in a way sufficiently public to identify or distinguish the marked [services] in an appropriate segment of the public mind.")).  CEFCU fails to explain how *Jim Mullen* is distinct from Ninth Circuit law and how the ruling in *Jim Mullen* applies to the specific facts of this case.  (Dkt. No. 350 at 6.)  Most significantly, neither *Jim Mullen* or any other Illinois case addresses the issue in this case whether one may acquire trademark rights to a tagline when it is displayed with a housemark.

---

[9] Page numbers to the parties' briefs are based on the CM/ECF pagination.

Accordingly, given that CEFCU has not produced relevant Illinois caselaw and it appears there is no Illinois law on point, the Court will apply federal law interpreting the common law on trademark.  To establish common law trademark rights for an unregistered mark, the owner must establish continuous use of the trademark in a commercial capacity.  *See Air Aromatics, Ltd. Liab. Co. v. Hakim*, 556 Fed. App'x 622, 623 (9th Cir. 2014) (citing *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005) ("To establish a protectable ownership interest in a common law trademark, the owner must 'establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present.'")); *see e.g.*, *Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc*., 493 F.2d 709, 713 (9th Cir. 1974) (In an action for trademark infringement, a party asserting common law trademark rights must show continuous use prior to the date of the junior user's trademark registration.).  For purposes of establishing protectable rights in a trademark, use of the mark must be "sufficiently public" that the trademark is "identif[ied] or distinguish[ed] . . . in an appropriate segment of the public mind as those of [the adopter of the mark]."  *Johnny Blastoff, Inc.v. Los Angeles Rams Football Co*., 188 F.3d 427, 433–34 (7th Cir. 1999) (quoting *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)).

To establish that the public identifies the mark with a particular product source, the fact-finder may rely on its use in "'advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications,' as well as in media outlets such as television and radio."  *Id.* at 434 (citations omitted); *see also Comm'cns. Satellite Corp. v. Comcet, Inc*., 429 F.2d 1245 1248–49 (4th Cir. 1970) (holding that plaintiff's promotion and use of the distinctive mark "Comsat" as an abbreviation for its company, together with frequent references to the company by the Comsat name in magazines and newspapers, was sufficient to support a finding that the name was a strong and protectable mark).

Despite CEFCU's argument that Ninth Circuit law is irrelevant and that only Illinois law applies, CEFCU, as well as SDCCU, rely on *Quiksilver, Inc. v. Kymsta*

*Corp.*, 466 F.3d 749 (9th Cir. 2006) to support their respective positions. *Quiksilver* addressed how a party may obtain trademark rights in a mark separate from a housemark. In that case, the Ninth Circuit reversed the district court's ruling in favor of Quiksilver on its motion for judgment as a matter of law concluding that there were fact issues on the validity of the registered trademark ROXY. *Id.* at 751. There, Quiksilver filed a trademark infringement action as well as false designation of origin, trademark dilution and unfair competition against Kymsta which raised several defenses including first use, inherent distinctiveness and innocent use. *Id.* at 754.

The import of *Quiksilver* is better understood with a brief description of the facts. In September 1990, Quiksilver launched its junior line at a trade show using a poster featuring a logo displaying "'QUIKSILVER' in corporate script on the left, a 'Bali-ohm' woman's figure in the middle, and 'ROXY' on the right." *Id.* at 752. It took orders of its junior line in January 1991. *Id.* In September 1991, Quiksilver began selling two new design denim items: "a vest displaying a patch with 'ROXY' in large letters above 'QUIKSILVER' in corporate script . . . and a 'graffiti short' displaying 'ROXY' on the right back pocket and 'QUIKSILVER' wrapping around from the left front pocket to the left back pocket." *Id.* The hangtag that was attached to the apparel for the1992 line included QUIKSILVER in corporate script above ROXY in a different font. *Id.* at 753. The defendant, Kymsta, also manufactured clothing and produced a junior trendy line called ROXYWEAR. *Id.* at 754. The first sale of ROXYWEAR clothing occurred in mid-January 1992 where ROXYWEAR was displayed on the interior clothing label but never on the fabric of its garments or its hangtags. *Id.*

The district court ruled in favor of Quiksilver as to Kymsta's affirmative defenses and found the first use of ROXY was on the 1991 graffiti short and concluded that ROXY was valid and Quiksilver was the senior user. *Id.* The Ninth Circuit reversed, in part, and found that Kymsta provided evidence to rebut the presumption of validity of Quiksilver's registered trademark for ROXY by raising factual issues whether Kymsta used its mark ROXYWEAR in commerce before Quiksilver first used the ROXY mark.

1  *Id.* at 756.  The Ninth Circuit held that 1) reasonable minds could differ whether

2  Quiksilver first used ROXY as a *standalone mark* before Kymsta first used

3  ROXYWEAR, and 2) reasonable minds could differ whether Quiksilver created

4  *independent trademark significance* for its ROXY mark before Kymsta first used

5  ROXYWEAR.  *Id.* at 756-58 (emphasis added).

6       Applying *Quiksilver* here, the Court will consider whether CEFCU has

7  demonstrated continuous use of NOT A BANK. BETTER. in commerce as a standalone

8  mark and whether CEFCU created independent trademark significance for the tagline.

9       **3.**     **Standalone Mark**

10       CEFCU argues that it may obtain rights to a tagline even though it is used with a

11  housemark; therefore, demonstrating standalone use of NOT A BANK. BETTER. is

12  "legally irrelevant."  (Dkt. No. 350 at 6, 8.)  Based on its theory, CEFCU argues that it

13  has continuously used NOT A BANK. BETTER. since 2006 even though it has primarily

14  been used with its housemark, CEFCU.  SDCCU asserts that CEFCU failed to show that

15  it used the tagline apart from its housemark when it advertised its services and any

16  independent use of the tagline was *de minimus* or not linked to any information about its

17  services.  (Dkt. No. 347 at 8-11.)

18       In *Quiksilver*, the Ninth Circuit specifically held that reasonable minds could differ

19  on whether Quiksilver first used ROXY as a standalone mark before the alleged infringer.

20  *Quiksilver*, 466 F.3d at 756.  But the court did not provide any guidance on what it meant

21  by using a mark as a "standalone."  In coming to its conclusion, the court pointed to the

22  physical distance between the display of ROXY and QUIKSILVER on the shorts.  *Id.* at

23  757.  It concluded that a reasonable jury could conclude that the shorts did not display

24  ROXY as a standalone mark and could infer that the shorts displayed the QUIKSILVER

25  ROXY mark.  *Id.*  Further, the court pointed to the poster using ROXY and

26  QUIKSILVER with the Bali-ohm logo, explaining that reasonable minds could differ on

27  whether Bali-ohm logo displayed the standalone ROXY mark or the QUIKSILVER

28  ROXY mark.  *Id.*

The Court finds that use of a mark in standalone fashion is relevant because such use evidences the intent of the mark owner to distinguish the mark in the minds of the public.  The Court reads *Quiksilver* as recognizing that a mark owner seeking protection of a mark may gain some level of commercial impression for the mark by displaying it separately or distinctly from the housemark.

At trial, CEFCU provided evidence that it used the tagline by itself on a few occasions.  CEFCU first used NOT A BANK. BETTER, by itself and separate from the housemark in the Decatur Herald and Review on October 16, 2006 which ran for one day.  (Trial Ex. CC - 4645-47.)  Again, for a period of two months starting on February 1, 2008, the tagline was used by itself and with the former tagline "CEFCU. Your Credit Union" in its pocket schedules.  (Trial Ex. CC-4510.)  After rebranding in 2011, the tagline, itself, was displayed on the back side of 1.1 million business cards that were printed and distributed to employees from 2011 to the present as well as used on CEFCU's landing page since 2017.  (Trial Exs. C-13; DD.)  This evidence reveals some standalone use of the tagline by CEFCU.  There was also evidence that CEFCU brand guidelines adopted in 2011 did not permit the logo to be altered in any manner, other than variations in color, and the tagline was never to be displayed by itself.  (Dkt. No. 348, Flexer Test. at 197:20-199:5; 202:22-203:3.)

While there may have been limited standalone use, it was de minimis, sporadic and insufficient alone to establish a valid and protectable interest in a trademark.  As such, the Court will next review the entire record to determine whether CEFCU has created independent significance for NOT A BANK. BETTER.

### 4.    Independent Trademark Significance

Whether a mark has acquired trademark significance independent of the housemark "depends on the manner of use and the commercial impression engendered by that use", *Quiksilver*, 466 F.3d at 757 (citing *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1374 (Fed. Cir. 2002)), and whether the mark is "'recognized in and of itself as an indication of origin' for the product."  *Id.* at 757 (quoting *Textron Inc. v. Cardinal*

*Eng'g Corp.,* 164 U.S.P.Q. 397, 399 (T.T.A.B. 1969)).  The court considers whether the mark owner engaged in "a constant pattern or effort . . . to use . . . [the product mark] in a manner separate and distinct from [the house mark]." *Id.* (quoting *Textron Inc*., 164 U.S.P.Q. at 400).  In addition, the court should consider "consumer awareness of the product mark apart from the fame of the associated house mark," the "strength of the public reputation of the product mark," and the "nature and context of promotion." *Id.* (quoting *Bose Corp.*, 293 F.3d at 1374).  Courts should consider the totality of the evidence.  *See id.*

In line with *Quiksilver,* courts and the Trademark Trial and Appeal Board ("TTAB") have consistently applied a similar legal standard to determine whether a mark has obtained independent significance separate from a housemark.  For example, in *Bose*, a case cited in *Quiksilver,* Bose opposed a trademark application before the TTAB to register POWERWAVE where Bose claimed, on the issue of likelihood of confusion, that its marks WAVE and ACOUSTIC WAVE were independently famous.  *Bose*, 293 F.3d at 1373-74.  The TTAB concluded that Bose's marks WAVE and ACOUSTIC WAVE were not independently famous because they were used with the BOSE housemark.  *Id.* The Federal Circuit agreed with the TTAB that product marks used with a famous house mark must show that the product marks have independent trademark significance apart from the fame associated with the housemark.  *Id.* at 1374 (citing Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7.5 (4th ed. 1999) ("Whether or not a product mark always used with a house mark possesses a separate trademark significance depends on the manner of use and the commercial impression engendered by that use.")).  But the Federal Circuit disagreed with the TTAB's conclusion and noted there was "overwhelming evidence" that the product marks stood independent of its famous house mark.  *Id.* at 1375.  First, the "critical notice given to the products specifically note[d] the ACOUSTIC WAVE and WAVE marks separate from the Bose marks" and there was significant "evidence of advertising and sales literature that decouple[d] the product marks from the famous house mark." *Id.*

1    Similarly, in *Textron*, the defendant sought to register ZIP-ZAW for a portable saw
2  for cutting concrete and masonry which Textron opposed arguing it had continuously
3  used ZIP on its portable saws before the defendant.  *Textron, Inc*., 164 U.S.P.Q. 397, at
4  *1    The question was whether or not Textron had used ZIP alone or used it as part of a
5  composite mark associated with the housemark HOMELITE.  *Id.* at *3-4.  The TTAB
6  explained "whether or not a particular designation used on a product along with a house
7  mark possesses a separate trademark significance depends on the manner in which it is
8  used and the commercial impression engendered as a result of such use."  *Id.* at *4.  The
9  record showed that Textron adopted the mark ZIP with the intent to create a distinctive
10 product mark for a particular chain saw of its manufacture and that Textron had used the
11 term ZIP both alone and in association with a three arc design in a manner separate and
12 distinct from HOMELITE.  *Id.*

13    In *In re Colgate-Palmolive Co*., 153 U.S.P.Q. 695 (1967), the TTAB disagreed
14 with the examiner and concluded that the slogan, THE MOST POWERFUL NAME IN
15 CLEANING, can be separately registered as a trademark even though it has been used as
16 AJAX, THE MOST POWERFUL NAME IN CLEANING.  *Id.* at *1-2.  In coming to its
17 conclusion, the TTAB noted that a slogan which is used with a principal mark may be
18 registered separately as long as the "the portion sought to be registered forms a separate
19 commercial impression or has acquired a secondary meaning."  *Id.* at *1.  The question
20 was whether the slogan "is merely a part of the composite mark" or "create[d] a separate
21 commercial impression apart from the word 'AJAX' and [was], therefore, an independent
22 trademark."  *Id.*  Based on the evidence in the case, the TTAB concluded the slogan had
23 been advertised and used by the applicant to create a commercial impression separate and
24 apart from the mark AJAX.  *Id.* at *2.

25    Here, CEFCU, relying on *Quiksilver*, argues that by its use of CEFCU. NOT A
26 BANK. BETTER. in advertising, the tagline has acquired independent trademark
27 significance because CEFCU's use of the tagline is in a different print style, different size
28 lettering, and different position relative to the housemark.  (Dkt. No. 350 at 8.)  Next,

CEFCU contends that Dr. On Amir's survey demonstrated a high level of consumer awareness of NOT A BANK. BETTER. in central Illinois.  (*Id.*)  Finally, NOT A BANK. BETTER. has appeared as a tagline in tens of millions of dollars of print, radio, television, direct mail, and internet advertising of CEFCU services since 2006.[10]  (*Id.*)  SDCCU disputes CEFCU's assertions contending that varying the size, font and color do not establish independent trademark significance; moreover, unlike the ROXY mark which was registered and enjoyed the presumption of validity, NOT A BANK. BETTER. is not a registered mark and enjoys no presumption of validity.  (Dkt. No. 347 at 7-8.)

Based on the evidence presented at trial, CEFCU has not demonstrated that it has created independent trademark significance for NOT A BANK. BETTER.  First, it did not engage in a constant pattern or effort to use the mark in a manner separate and distinct from the housemark.  In fact, CEFCU took pains to use the housemark along with the tagline.  While the print style, font size and position of the tagline may support a finding of independent trademark significance, by themselves, they do not establish it. *See Quiksilver*, 466 F.3d at 758 (displaying ROXY in different size, font and color may suggest it acquired independent trademark significant, it does not establish it).  Next, as discussed in more detail below, the Court gives Dr. Amir's testimony little or minimal weight.  Finally, CEFCU's argument that it has used NOT A BANK. BETTER. and spent "tens of millions of dollars" on advertising using the tagline since 2006 is not persuasive

---

[10] In its closing reply brief, CEFCU cites to Exhibit E, a table reflecting assets, income and liabilities from 2006 to 2019, to support its claim that it has spent tens of millions of dollars on advertising.  (Dkt. No. 350 at 8 (citing Trial Ex. E and Flexer Test. at 147-48).)  However, at trial, Ms. Flexer did not explain the contents of the tables.  (*See* Dkt. No. 348, Flexer Test. at 147:13-23.)  On the Court's review, the tables do not list advertising as an expense; instead, it lists "Communications", "Member Education" and "Other."  (Trial Exs. E-6 to E-19.)  Therefore, it is not clear where advertising falls under the Expense category.  Although not referenced by CEFCU concerning advertising expenses, Exs. T to BB, consist of annual reports from 2010 to 2018 that include a line item for marketing expenses.  (Trial Exs. T to Ex. BB.)  Yet, the sum of the advertising expenses in the annual reports do not reach anywhere near the tens of millions of dollars CEFCU asserts it spent. While the record does not demonstrate that tens of millions of dollars were spent on advertising of CEFCU. NOT A BANK. BETTER. it does reveal that a significant amount of money was spent on advertising it.

because CEFCU's use of NOT A BANK. BETTER. in advertising has nearly always been used with the housemark, CEFCU.   (Dkt. No. 348 Flexer Test. at 197:11-22 (since 2011 CEFCU employed 40,000 projects which all included the logo, CEFU. NOT A BANK. BETTER).)  With the exception of a newspaper ad that ran for one day on October 16, 2006, its use on pocket schedules for two months starting in February 2008, printing of 1.1 million business cards since 2011 and use on the landing page of its website since 2017, CEFCU has spent the vast majority of its "tens of millions of dollars" of advertising expenses in support of CEFCU. NOT A BANK. BETTER.  *See Spraying Sys. Co. v. Delvan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992) (rejecting plaintiff's argument that the district court failed to give adequate consideration of evidence of sales, advertising and use of its "-JET" marks because the evidence did not demonstrate secondary meaning in the "-JET" mark but instead showed extensive recognition of the composite marks).  By using the housemark and tagline together, CEFCU created independent trademark significance in the registered mark and not the tagline. Ultimately, CEFCU failed to provide evidence that significant advertising was spent promoting the tagline separately from the housemark or any other evidence of a "constant pattern or effort . . . to use . . . [NOT A BANK. BETTER] in a manner separate and apart from [CEFCU]."[11]  *See Quiksilver*, 466 F.3d at 757.

### 5.   Abandonment

Lastly, SDCCU argues that even if the limited evidence of use of the tagline was sufficient to create trademark rights, CEFCU intentionally abandoned its rights to the tagline, itself, since rebranding in 2011 as the new branding guidelines required that the tagline only be displayed together with the CEFCU housemark in all of its advertising. (Dkt. No. 347 at 12.)  CEFCU argues that SDCCU has not cited a case that the "complete

---

[11] While not argued in its closing briefs, at trial, it appeared that CEFCU was suggesting that the TV and radio ads included pauses between stating CEFCU and NOT A BANK. BETTER.  However, the alleged pause in the radio announcements the Court heard at trial was insignificant and does not distinctly create a separate commercial impression for the tagline.

cessation" requirement is satisfied by a mark being used together with a housemark. (Dkt. No. 343 at 9.)

To demonstrate abandonment, SDCCU must show "(1) discontinuance of trademark use *and* (2) intent not to resume such use." *Electro Source, LLC v. Brandess– Kalt–Aetna Grp., Inc.*, 458 F.3d 931, 935 (9th Cir. 2006) (citing 15 U.S.C. § 1127) (emphasis in original). Three consecutive years of non-use is "prima facie evidence of abandonment." 15 U.S.C. § 1127. The term "discontinued" in this context requires "*complete* cessation or discontinuance of trademark use." *Id.* at 938 (emphasis in original). "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Id.* (quoting *Carter Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970)).

"When a prima facie case of non-use is shown, there is a rebuttable presumption that the trademark owner has abandoned the mark without intent to resume use." *Marketquest Grp. Inc. v. BIC Corp.,* 316 F. Supp. 3d 1234, 1282 (S.D. Cal. 2018) (citations omitted). Abandonment of a trademark "must be strictly proved." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010) (quoting *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal*., 694 F.2d 1150, 1156 (9th Cir. 1982)). "The burden of persuasion . . . always remains with the petitioner to prove abandonment . . . ." *On–Line Careline, Inc. v. America Online, Inc*., 229 F.3d 1080, 1087 (Fed. Cir. 2000) (internal quotations and citation omitted); *Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 411 n.4 (9th Cir. 1996) (the burden of proof does not shift to the trademark owner simply because a prima facie case of non-use is made). Whether the presumption even comes into play is a key issue for even a "single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Marketquest Grp. Inc*., 316 F. Supp. 3d at 1282.

SDCCU has not demonstrated abandonment of the tagline by CEFCU. The record shows that from 2011 to the present, CEFCU printed and distributed 1.1 million business cards that displayed the tagline, by itself, on the backside. Marks used on business cards

constitute "use in commerce" under the Lanham Act.  *See* 15 U.S.C. § 1125(a); *Meridian Transp. Resources, LLC v. Magic Carrier Resources LLC*, 518 F. Supp. 2d 1255, 1261 (D. Or. 2007) (use of trademark and logo on website, advertising and business cards constitute "use in commerce"); *RGB Plastic, LLC v. First Pack, LLC*, 184 F. Supp. 3d 649, 658 (N.D. Ill. 2016) (citing *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc*., No. 11 C 02242, 2013 WL 6839815, at *13 (N.D. Ill. Dec. 27, 2013) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:83 (4th ed.) ("Use sufficient to support service mark registration includes such things as business cards, stationery, circulars, brochures, invoices, direct mailing pieces, advertisements, store signs and almost every type of printed matter.")).  Moreover, NOT A BANK. BETTER. has been displayed, by itself, on the landing page of CEFCU's website since 2017.  Therefore, SDCCU has not proved CEFCU discontinued use of the tagline, NOT A BANK. BETTER.[12]

While SDCCU has not demonstrated that CEFCU discontinued use of the tagline, the Court concludes that CEFCU has not shown it has a valid and protectable interest in the tagline NOT A BANK. BETTER.  On this basis alone, SDCCU is entitled to a declaratory judgment of invalidity.  However, given that SDCCU asserts that the mark is also invalid as a merely descriptive mark, the Court will also analyze this claim.

**B.     Inherently Distinctive and Acquired Distinctiveness/Secondary Meaning**

Alternatively, SDCCU's fourth cause of action seeks to have CEFCU's mark declared invalid as a mark which is merely descriptive.  SDCCU submits that the mark is merely descriptive and is invalid.  Meanwhile, CEFCU argues that NOT A BANK.

---

[12] Because the record shows that the tagline, by itself, was used and not abandoned by CEFCU, the Court need not address whether abandonment applies when a tagline has been continuously used along with a housemark.

BETTER. is inherently distinctive and has acquired distinctiveness through secondary meaning.[13]  (Dkt. No. 343 at 11.)

### 1.   Merely Descriptive Mark

At common law, neither terms which were generic nor those which were merely descriptive could become valid trademarks, *see Delaware & Hudson Canal Co. v. Clark*, 80 U.S. 311, 323 (1872) ("Nor can a generic name, or a name merely descriptive of an article or its qualities, ingredients, or characteristics, be employed as a trademark and the exclusive use of it be entitled to legal protection").  Under the modern definition of the term "trademark," both state common law and federal law follow the definition set forth in the federal Lanham Act of 1946.  2 J. McCarthy, Trademarks and Unfair Competition § 4:3 (4th ed. 2004).

Courts may analyze all components of the mark in determining whether those parts, taken together, merely describe the goods or services offered.  *Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190, 1201 (9th Cir. 2009).  If each component retains its descriptive significance in relation to the goods or services, the combination results in a composite that is itself descriptive.  *Duopross Meditech Corp. v. Inviro Med. Devices, Ltd*., 695 F.3d 1247, 1250, 1255 (Fed. Cir. 2012) (SNAP SIMPLY SAFER merely descriptive for "'medical devices, namely, cannulae; medical, hypodermic, aspiration and injection needles; medical, hypodermic, aspiration and injection syringes'").  However, the validity of composite term is be determined by viewing the trademark as a whole and not by an examination of its parts.  *California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1455 (9th Cir. 1985).  Further, the mere combination of words is insufficient in itself to

---

[13] In its trial brief, CEFCU argued that NOT A BANK. BETTER. was inherently distinctive and also acquired distinctiveness or secondary meaning.  (Dkt. No. 302 at 16, 20-21.)  Yet, after trial, in its closing briefs, CEFCU disposes of the inherently distinctive argument and solely argues that NOT A BANK. BETTER. has acquired distinctiveness.  (Dkt. No. 343 at 9-11; Dkt. No. 350 at 10-11.)  It appears that CEFCU may have abandoned its argument concerning inherently distinctive after the evidence presented at trial.  In any event, the Court addresses both positions.

make a mark registrable.  *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.,* 601 F.2d 1011, 1018 (9th Cir. 1979).

Marks that extol some feature or attribute of the goods or services are "laudatory" and fall into the descriptive category.  2 J. McCarthy, Trademarks and Unfair Competition § 11:71 (4th ed. 2004); *see In re Best Software, Inc*., 58 U.S.P.Q. 2d 1314, 2001 WL 204235, at *1 (T.T.A.B. 2001) (The terms "best" and "premier" are descriptive as self laudatory and must be disclaimed from the designation "BEST! SPORTPLUS PREMIER" for computer consultation and support services).

In determining whether a mark is suggestive or descriptive, the Ninth Circuit has observed that "clearly the most used[] test is known as the 'imagination' test." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010); *accord Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1033 (9th Cir. 2010) ("[A] mark is more likely suggestive if it passes the imagination test, which asks whether the mark 'requires a mental leap from the mark to the product.'"); *see also* 2 J. McCarthy, Trademarks and Unfair Competition § 11:71 (4th ed. 2004) ("Is some reflection or multistage reasoning process necessary to cull some direct information about the product from the term used as a mark?").  The "imagination" test asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Zobmondo Entm't, LLC*, 602 F.3d at 1115 (citation omitted).

A second test used in the Ninth Circuit is the "competitor test" and "focuses on the extent to which a mark is actually needed by competitors to identify their goods or services." *Zobmondo Entm't, LLC*, 602 F.3d at 1117 (quoting *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987)); *Fortune Dynamic, Inc.,* 618 F. 3d at 1033-34 (mark is more likely suggestive if "the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods."); 2 J. McCarthy, Trademarks and Unfair Competition § 11:68 (4th ed. 2004); *Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1299 (5th Cir. 1985) (to

determine the descriptive/suggestive categorization, court applied: (1) the imagination test; and (2) whether competitors are likely to use or actually do use the term descriptively). The mark is most likely descriptive if competitors have a great need to use a mark. *Zobmondo Entm't, LLC*, 602 F.3d at 1117. The imagination and competitor tests are inversely related such that "[t]he more imagination that is required to associate a mark with the product, the less likely the words used will be needed by competitors to describe their products [or services]." *Id.* at 1117 (quoting *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987)).

Here, the mark "NOT A BANK. BETTER" is a composite term that presents two separate ideas: "NOT A BANK" and "BETTER". As to "BETTER", the term is descriptive as a laudatory term. Meanwhile, "NOT A BANK" is not subtle and does not require a multistage reasoning process or a mental leap from the mark to the product that it describes, a credit union. Plainly, a credit union is not a bank although both are financial institutions that engage in similar types of services such as extending various types of loans and providing services such as checking and savings accounts and debit cards. The connection is sufficiently obvious that SDCCU has itself employed a similar laudatory expression, "BETTER", to distinguish itself from banks. Further, considering the tagline as a whole, there is little reflection required to "cull some direct information" that CEFCU is a financial institution that is not a bank or to recognize the puffery supplied that it is better than a bank. *See* 2 J. McCarthy, Trademarks and Unfair Competition § 11:71 (4th ed. 2004).

Also, the language that makes up the tagline is sufficiently generic as a means to distinguish credit unions from banks, that competitors would have a need to employ similar language in presenting themselves as different and better than banks. *See Fortune Dynamic, Inc*., 618 F.3d at 1034 (other shoes companies are unlikely to use the word "delicious" to describe their products noting that the court was unaware of any other show companies and the defendant pointed to none that use the word "delicious" to describe their product). SDCCU's use of BETTER in its trademark is an indication that

other credit unions try and need to distinguish themselves from banks.  Finally, because little imagination is required to connect the CEFCU's mark to credit union services, the more likely that competitors would have a need to use components of or the composite mark.  *See id.*  Therefore, under both the imagination and competitor tests, NOT A BANK. BETTER. is descriptive.

In its trial brief, CEFCU presents two reasons why the tagline is inherently distinctive.  First, it argues that NOT A BANK. BETTER. is not defined in a dictionary.  While the tagline is not defined, "BANK" and "BETTER" are defined separately in the dictionary and intended to convey the dictionary meaning.  Moreover, even though the entire tagline is not defined in a dictionary, the dictionary is merely a starting place to differentiate descriptive and suggestive marks.  *See Fortune Dynamic, Inc.,* 618 F.3d at 1033; *Surgicenters of Am., Inc.*, 601 F.2d at 1015 n. 11 ("While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public . . . .).  The fact that the phrase is not found in the dictionary is afforded little weight.  Further, use of a common punctuation mark, a period, is not sufficient to negate the mere descriptiveness of a term.  *In re Brock Residence Inns, Inc*., 222 U.S.P.Q. 920, 1984 WL 63072, at *2 (T.T.A.B. 1984) (FOR A DAY, A WEEK, A MONTH OR MORE!, even with the exclamation point, merely descriptive of hotel services).

Second, CEFCU asserts that the USPTO did not require a disclaimer of NOT A BANK. BETTER. when it recorded the '993 registration for CEFCU. NOT A BANK. BETTER.  (Dkt. No. 302 at 16-17.)  Because the USPTO did not require a disclaimer of the phrase NOT A BANK. BETTER, it is a strong indication that the USPTO did not consider the phrase merely descriptive of credit union services.  (Dkt. No. 343 at 5 (citing *Cross Com. Media, Inc. v. Collective, Inc*., 841 F.3d 155, 166 (2d Cir. 2016) (registration of a composite mark without disclaimer of component parts supported a registrant's argument that the unregistered component was more than merely descriptive)).

1   Pursuant to 15 U.S.C. § 1056(a), the PTO "may require [an] applicant to disclaim
2   an unregistrable component of a mark otherwise registrable."  15 U.S.C. § 1056(a).
3   Although the PTO Examining Attorney is obligated to consider whether a disclaimer is
4   appropriate for each application reviewed, the decision remains a discretionary choice
5   rather than a conclusive legal determination.  *See In re Creative Goldsmiths of Wash.,*
6   *Inc.*, 229 U.S.P.Q. 766, 768 (T.T.A.B.1986) ("[W]e conclude that it is within the
7   discretion of an Examining Attorney to require the disclaimer of an unregistrable
8   component (such as a common descriptive, or generic, name) of a composite mark sought
9   to be registered on the Principal Register under the provisions of Section 2(f)."); *see also*
10  Trademark Manual of Examining Procedure, § 1213(a)-(c) (5th ed. 2007).

11      Further, "a decision by the PTO to either require a disclaimer or not is merely a
12  single piece of evidence in the court's overall genericism analysis."  *Boston Duck Tours,*
13  *LP v. Super Duck Tours*, LLC, 531 F.3d 1, 22 (1st Cir. 2008) (*citing In re Nat'l Data*
14  *Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985) ("The power of the PTO to accept or require
15  disclaimers is discretionary under the statute, and its practice over the years has been far
16  from consistent.  Thus, it is inappropriate to give the presence or absence of a disclaimer
17  any legal significance.") (internal citation omitted)).  In this case, the USPTO did not
18  require a disclaimer to any portion of the registered mark which provides one piece of
19  evidence to support CEFCU's argument but is not dispositive of the issue.  However, the
20  Court finds that this fact is outweighed by the court's analysis under the imagination and
21  competitor tests.

22      In view of the foregoing analysis, the Court concludes that CEFCU has not met its
23  burden demonstrating that NOT A BANK. BETTER. is inherently distinctive.  Next, the
24  Court considers whether CEFCU has established acquired distinctiveness or secondary
25  meaning in NOT A BANK. BETTER.

26      **2.      Acquired Distinctiveness or Secondary Meaning**

27      A descriptive term identifies a characteristic or ingredient of an article or service
28  and is not protectable as a trademark.  *See* 15 U.S.C. § 1052(e)(1); *Zobmondo*, 602 F.3d

at 1114.  Descriptive marks may become valid marks by acquiring a secondary meaning in the minds of the consuming public.  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985); 15 U.S.C. § 1052(f).

"The burden of proof of secondary meaning is upon the party trying to establish legal protection for the mark".  1 J. McCarthy, Trademarks and Unfair Competition § 15:11A at 686 (2d ed. 1984); *cf. Levi Strauss & Co. v. Genesco, Inc*., 742 F.2d 1401, 1405 (Fed. Cir. 1984) ("one seeking to register [the proposed trademark] bears the burden of showing secondary meaning under Section 2(f)."); *accord Yamaha Int'l Corp. v. Hoshino Gakki Co*., 840 F.2d 1572, 1579 (Fed. Cir. 1988).

 Secondary meaning is the "mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product."  *Levi Strauss & Co. v. Blue Bell, Inc*., 778 F.2d 1352, 1354 (9th Cir. 1985) (internal quotations omitted); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1379 (Fed. Cir. 2012) (to demonstrate that a term has acquired distinctiveness, "an applicant must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.").

The difference between distinctiveness and secondary meaning "may be thought of this way: A mark or trade dress may be inherently distinctive whereas secondary meaning is a learned association, an acquired distinctiveness."  *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc*., 4 F.3d 819, 824 (9th Cir. 1993).  "If buyers take the word to refer only to a particular producer's goods or services, it is not generic.  But if the word is identified with all such goods or services, regardless of their suppliers, it is generic and so not a valid mark."  *Surgicenters of Am., Inc.*, 601 F.2d at 1016.

"Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchases of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark and, (4) whether use of the claimed trademark has been exclusive." *Levi*

*Strauss & Co.*, 778 F.2d at 1358 (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp*., 768 F.2d 1001, 1015 (9th Cir. 1985) (citing 1 Gilson, Trademark Protection & Practice, § 2.09[1])). "While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it." *Id.*

"A plaintiff may establish secondary meaning through direct and circumstantial evidence." *Continental Lab'y Prods., Inc. v. Medax Int'l, Inc.,* 114 F. Supp. 2d 992, 999 (S.D. Cal. 2000) (citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:30 (4th ed. 2000)).  Direct evidence, such as consumer surveys provides the most persuasive evidence of secondary meaning. *Levi Strauss & Co*., 778 F.2d at 1358; *Vision Sports*, 888 F.2d at 615.  "A plaintiff may also establish secondary meaning through circumstantial evidence, such as: exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market." *Continental Lab'y Prods*., 114 F. Supp. 2d at 1000 (citing *Filipino Yellow Pages v. Asian Journal Publ'n*, 198 F.3d 1143, 1151 (9th Cir. 1999)).

CEFCU argues it has shown that the tagline has acquired distinctiveness through direct and indirect evidence.  (Dkt. No. 343 at 11.)  According to CEFCU, the following indirect evidence supports acquired distinctiveness: 1) more than 14 years of regular use of NOT A BANK. BETTER. in its advertising and marketing; 2) "tens of millions of dollars spent on print, television, radio, internet and member education activity featuring the tagline NOT A BANK. BETTER."; 3) "hundreds of millions of dollars earned while using the tagline NOT A BANK. BETTER."; 4) "tens of thousands of new members attracted while using the tagline NOT A BANK. BETTER."; 5) "billions of dollars of assets managed while using the tagline NOT A BANK. BETTER".; 6) "non-use of NOT A BANK. BETTER. by CEFCU competitors" and (vii) "survey evidence proffered by SDCCU, in which a substantial segment (27%) of the respondents exposed to a slogan

similar to NOT A BANK. BETTER. identified CEFCU as the source of that slogan."
(Dkt. No. 343 at 11.)

As discussed above, CEFCU's evidence of fourteen continuous years of use of
NOT A BANK. BETTER., and "tens of millions of dollars" spent on all types of
advertising which led to increased members and increased assets provide little support for
CEFCU's claim of secondary meaning for the tagline NOT A BANK. BETTER. because
the advertising moneys spent were almost exclusively used with the housemark, CEFCU.
*See Spraying Sys. Co.*, 975 F.2d at 393 (sales did not establish secondary meaning in the
"-JET" mark because it showed extensive recognition of the composite marks); *Vision
Sports, Inc. v. Melville Corp*., 888 F.2d 609, 615 (9th Cir. 1989) (secondary meaning
established based on extensive use and promotion of the VSW logo separate from the
wordmark).

Next, nonuse of NOT A BANK. BETTER. by competitors of CEFCU, (Dkt. No.
348, Flexer Test. at 148:9-12), may be relevant to demonstrate secondary meaning.  *See
Levi Strauss & Co*., 778 F.2d at 1358.  However, nonuse of the tagline by competitors, by
itself, cannot demonstrate secondary meaning.  *See id.*  That is particularly the case when
CEFCU's tagline is composed of terms that are descriptive.

Finally, in its closing brief, instead of relying on Dr. Amir's survey evidence,
CEFCU now argues that Dr. Nowlis' rebuttal survey report supports secondary meaning
summarily asserting that a "substantial segment (27%) of the respondents exposed to a
slogan similar to NOT A BANK. BETTER. identified CEFCU as the source of that
slogan."  (Dkt. No. 343 at 11 (citing Apr. 1 Tr. at 428).)  CEFCU's argument is neither
factually nor legally supported.  Page 428 of the trial testimony provides only a question
to Dr. Nowlis confirming that he found there was 27% confusion rate for the SDCCU
slogan.  (Dkt. No. 349, Dr. Nowlis Test. at 428:11-21.)  Contrary to CEFCU's
conclusion, Dr. Nowlis' testimony and Table 4 shown at trial do not show that his survey
revealed that 27% of the respondents that were shown NOT A BANK. BETTER.
identified CEFCU as the source.  No evidence was provided as to the specific questions

28

posed by Dr. Nowlis' survey. Accordingly, reliance on Dr. Nowlis' survey results is without merit. Moreover, without any analysis, CEFCU has not demonstrated that the confusion survey that Dr. Nowlis conducted has any bearing on secondary meaning in this case. Therefore, on the indirect evidence, nonuse of the tagline by competitors is the only evidence to support secondary meaning.

CEFCU also presented the direct evidence of Dr. On Amir's[14] survey evidence arguing his survey results clearly establish that consumer awareness of CEFCU and its tagline is very strong. (Dkt. No. 302 at 21.) SDCCU claims that Dr. Amir's survey is flawed for a number of reasons. CEFCU does not address SDCCU's arguments.

First, SDCCU claims that Dr. Amir's survey results are not reliable because he conducted a confusion survey and not a secondary meaning survey. Moreover, it maintains the unreliability of Dr. Amir's survey questions because they were "invented" or created with direction from CEFCU's counsel. (Dkt. No. 347 at 15-18.)

"It is true that evidence proving secondary meaning and evidence proving likelihood of confusion may sometimes overlap. But not always." *Parks LLC v. Tyson Foods, In*c., 863 F.3d 220, 234 (3d Cir. 2017) (citing 2 McCarthy on Trademarks § 15:11 n.1) ("Not every response rate that shows likely confusion establishes secondary meaning and not every survey that fails to show likely confusion establishes an absence of secondary meaning.") (quoting Vincent N. Palladino, *Secondary Meaning Surveys, in Trademark and Deceptive Advertising Surveys: Law, Law Science, and Design* 98 (2012)); *see Spraying Sys. Co. v Delvan*, 762 F. Supp. 772, 779 (N.D. Ill. 1991) ("However proper the survey question may have been to prove likelihood of confusion between the marks, it was improper to prove secondary meaning."), *aff'd*, 975 F.2d 387

---

[14] Dr. On Amir is a Professor at University of California, San Diego and Associate Dean of Programs at the Rady School of Management. (Dkt. No. 348, Dr. Amir Test. at 225:2-14; Trial Ex. EE 38-42.) He has conducted research in consumer behavior and consult with many companies as the chief variable science officer. (Dkt. No. 348, Dr. Amir Test. at 225:15-23.) He has conducted over 500 consumer studies which included brand awareness surveys for clients. (*Id.* at 225:18-226:2.)

(7th Cir. 1992).  Whether a confusion survey is probative of secondary meaning depends upon the format of the survey."  *Parks, LLC v. Tyson Foods, Inc.*, 186 F. Supp. 3d 405, 425 (E.D. Pa. 2016) (questions and images posed did not correlate to secondary meaning).

At trial, Dr. Amir testified that he conducted a likelihood of confusion survey versus a secondary meaning survey. (Dkt. No. 348, Dr. Amir Test. at 240:22-241:5; 246:15-17.)  He also testified that he was not testing whether or not the slogan was put out by a single source.  (*Id.* at 244:19-21.)  Instead, he testified that his questions tested for brand awareness.  (*Id.* at 238:12-18.)  He explained that in a brand awareness study, the first question is "Are you aware?", or in other words, aided awareness, and the second question is "Who is the company that uses that?"  (*Id.* at 246:4-7.)

Dr. Amir also testified that he used his survey design questions and adapted them to the survey questions used by Dr. John Linden in the *Jefferson Bankshares* case as well as suggestions by Mr. Dabney, CEFCU's counsel.  (*Id.* at 238:7-240:11; 242:6-21.)  He did not specify what changes he made based on Mr. Dabney's suggestions.  Dr. Amir also admitted he never saw the actual survey instrument used in the *Jefferson Bankshares* case. (*Id.* at 239:20-22.)  He further stated that he had never seen the question he used in his survey, "Please indicate whether this slogan is one you have, or have not, ever seen or heard used by a financial institution." in any other survey.  (*Id.* at 242:2-243:13.)  Dr. Amir acknowledged that Dr. Linden's survey was a confusion survey.  (*Id.* at 270:2-10.)

In *Jefferson Bankshares, Inc. v. Jefferson Sav. Bank*, CIV. A. No. 89-0022-C, 1989 WL 222446, at *4 (W.D. Va. Nov. 27, 1989), Dr. John Lindgren, the plaintiff's expert, conducted a survey to determine confusion where the survey tested "awareness levels for financial institutions."  *Id.*  Yet, in the secondary meaning analysis, the court did not rely on Dr. Lindgren's survey.  Instead, on secondary meaning, the district court concluded "Jefferson National Bank" acquired secondary meaning in the banking and finance fields as a service mark based on its $2.5 million expenditure in sales and advertising as well as its five-year exclusive use of the words "Jefferson" with "Bank".  *Id.* at *7.

1      The Court concludes that Dr. Amir's use of Dr. Lindgren's confusion survey

2  questions did not test for secondary meaning and CEFCU has not explained how the

3  questions posed to the respondents could elicit secondary meaning.  Moreover, the Court

4  also questions the reliability of the questions that were further modified by input from

5  CEFCU's counsel, who is not a survey expert.

6      Next, SDCCU contends that Dr. Amir's survey failed to test for secondary

7  meaning by asking the wrong questions.

8      In the survey, respondents were asked the following questions after being shown

9  the tagline, NOT A BANK. BETTER.

10         Q64 Please indicate whether this slogan is one you have, or have not, ever
           seen or heard used by a financial institution in the greater Peoria area? . . .

11

12         Q66 If you know or have an opinion, what financial institution uses this
           slogan? (please be as specific as possible)

13

14  (Trial Ex. EE-30.)  Based on the answers to these questions, Dr. Amir testified that the

15  results show that consumer awareness of CEFCU and its tagline NOT A BANK.

16  BETTER. is very high in the greater Peoria area.  (Dkt. No. 348, Dr. Amir Test. at

17  227:14-19.)  He stated that over 70% recognize the tagline as being used by a financial

18  institution in the greater Peoria area and about 50% identify it as CEFCU.  (*Id.* at 227:20-

19  24.)

20      "In order to track the accepted definition of secondary meaning . . .a proper

21  question should seek to determine whether or not a claimed trademark or trade dress is

22  associated with plaintiff's product without asking respondents to give plaintiff's name."

23  Vincent N. Palladino, *Surveying Secondary Meaning*, 84 Trademark Rep. 155, 162–67

24  (1994).  "Without endorsing any specific language, the question could be: "Do you

25  associate [claimed trademark] with [product identification] of one, or more than one,

26  company?"  *Id.* at 165.

27      In *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 138 (D. Mass

28  2003), the district court concluded that the survey question "What company do you think

31

puts out these products? If you do not know, please feel free to say so" was flawed to establish secondary meaning because it *presumed* the existence of a key element of secondary meaning, that is, associating the design with a single source. *Id.* at 138. This question already suggests to the respondents that the "products *did* come from a single manufacturer." *Id.* (emphasis in original); *see also Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc*., 765 F. Supp. 2d 884, 893 (S.D. Tex. 2011) (giving less weight to survey because question, "If you have an opinion, what is the brand of motor oil product in the picture I showed you?" is misleading and a better question would be "what is the brand or brands . . ." or "what company or companies puts out this product?"); *I.P. Lund Trading ApS v. Kohler Co*., 118 F. Supp. 2d 92, 107 n. 24 (D. Mass. 2000) (survey questions asking "Do you carry this line?" and "Do you know who makes this line of faucets?" were misleading because it suggests that the "faux customer is asking about a product made by a single source." and not a reliable measure of consumer association); *but see Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 960 (E.D.N.Y 1992) ("Who do you believe puts out this product?" was not misleading in survey to show secondary meaning); *McDonald's Corp. v. McBagel's Inc*., 649 F. Supp. 1268, 1277 (S.D.N.Y. 1986) ("Though you may or may not have seen or heard of this restaurant, who do you believe sponsors or promotes McBagels?" and "What products or services, if any, do you believe are sponsored or promoted by the same concern that sponsors or promotes McBagel's?" were leading but "did not fatally infect the survey.").

Dr. Itamar Simonson[15] and Dr. Stephen Nowlis,[16] SDCCU's rebuttal experts, also testified that the questions used in Dr. Amir's survey did not test for distinctiveness or

---

[15] Dr. Itamar is a Professor Emeritus at Stanford University and has taught doctoral courses about consumer research, decision making and survey methods. (Dkt. No. 349, Dr. Simonson Test. at 47:18-48:21, Trial Ex. 173.) He has designed hundreds of surveys for litigation related to secondary meaning, likelihood of confusion as well as other topics and written thousands of articles in his economic work and has qualified as an expert on market surveys. (*Id.*)

[16] Dr. Nowlis is a Professor of Marketing at Washington University in St. Louis, Missouri and teaches marketing management, brand management and consumer behavior. (Dkt. No. 349, Dr. Nowlis Test. at

secondary meaning and merely allowed the respondents to guess.[17]  (Dkt. No. 349, Dr. Simonson Test. at 343:1-11; Dkt. No. 349, Dr. Nowlis Test. at 396:25-397:24.)  Brand awareness is very different from secondary meaning which asks do you associate the tagline with one or more than one company.  (*Id.* at 396:25-397:24.)  Dr. Simonson testified that there are specific survey questions that have been accepted to assess secondary meaning and other questions to assess awareness.  (*Id.* at 344:5-16.)  But Dr. Amir's questions were designed for confusion and not secondary meaning or awareness.  (*Id.*)  He should have asked "Do you associate this tagline with one company or more than one company?"  (*Id.* at 345:11-21.)

Here, Dr. Amir's Q. 64 and Q. 66 are not model secondary meaning questions accepted by survey experts but cases have held that such questions may be acceptable or given some weight to show secondary meaning.  *Essie Cosmetics, Ltd.*, 808 F. Supp. at 960; *McDonald's Corp.*, 649 F. Supp. at 1277.  Given the deficiencies identified, the Court will accept but give less weight to the survey results because Dr. Amir's survey questions did not directly test for secondary meaning.

---

389:25-391:16; Trial Ex. 171.)  He has designed and run over 1000 surveys, including about 100 surveys for litigation and has been qualified as an expert in market surveys.  (Dkt. No. 349, Dr. Nowlis Test. at 391:17-392:5.)

[17] At trial, CEFCU repeatedly objected to the testimonies of Dr. Simonson and Dr. Nowlis as not being disclosed in their expert reports.  (*See generally* Dkt. No. 349, Trial Trans.)  At the conclusion of trial, the Court granted CEFCU leave to file a post-trial motion to exclude certain portions of Dr. Simonson and Dr. Nowlis' testimonies based on objections that were ***not*** raised at trial.  (*Id.* at 430:4-440:11.)  CEFCU filed a post-trial motion to exclude portions of Dr. Simonson and Dr. Nowlis' testimonies but it raises the same arguments it raised at trial.  (Dkt. No. 344.)  CEFCU argues that their testimonies were not disclosed in their expert reports in violation of Rule 37.  (*Id.*)  SDCCU filed a response contending that Dr. Simonson and Dr. Nowlis testified to the deficiencies in Dr. Amir's survey methodology which are contained in their expert reports.  (Dkt. No. 346.)  Because CEFCU raises the same objections as it did at trial, the Court relies on its ruling at trial.  At trial, the Court overruled CEFCU's numerous objections to the testimonies of Dr. Simonson and Dr. Nowlis and explained that it provided Dr. Amir latitude to testify about secondary meaning even though he was tasked with conducting a survey on likelihood of confusion; therefore, because Dr. Nowlis and Dr. Simonson, as rebuttal experts, were tasked with rebutting Dr Amir's testimony, they could also be given latitude to rebut Dr. Amir's secondary meaning survey evidence and opinions.  (Dkt. No. 349, Trial Trans. at 394:19-95:17; 440:2-8.)  Thus, the Court DENIES CEFCU's post-trial motion to exclude.

1    Next, SDCCU asserts that Dr. Amir's survey is flawed because he did not use a

2  proper control since his controls did not share any characteristics with the mark at issue;

3  for example, none included the words BANK or BETTER.  (Dkt. No. 347 at 18-19.)

4    "The general principle for choosing an appropriate control is easily stated: It

5  should share as many characteristics with the experimental stimulus as possible, with the

6  key exception of the characteristic whose influence is being assessed."  McCarthy,

7  McCarthy on Trademarks and Unfair Competition § 32:187 (quoting S.S. Diamond,

8  Control Foundations: Rationales and Approaches in Trademark and Deceptive

9  Advertising Surveys 210 (ABA, Eds. Diamond & Swann 2012)).  In addressing the

10  admissibility of a secondary meaning survey, one district court stated that "the control

11  bottle could have been more similar to the ROTELLA bottle to obtain a more accurate

12  measure of confusion" and was "troubled that the control chosen seems to share virtually

13  no features with the ROTELLA bottle besides the basic fact that they are motor-oil

14  bottles."  *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc*., 765 F. Supp. 2d 884, 894

15  (S.D. Tex. 2011).  Therefore, the court noted the control used was slightly problematic

16  but not enough to justify exclusion of the evidence.  *Id.*

17    Dr. Amir explained he used four criteria to select the controls 1) it had to be a

18  tagline, 2) it had to be a credible slogan that could be used by a financial institutional, 3)

19  the control slogan must not actually be used by a financial institution in the greater Peoria

20  area, and 4) must not share any of the same words as the mark in order to avoid any

21  mental association with the senior mark or CEFCU.  (Dkt. No. 348, Dr. Amir Test at

22  256:1-22.)  Therefore, he selected "Your Money Works Here" and "The Future is Yours

23  to Save" as controls.  (Dkt. No. 348, Dr. Amir Test. at 255:9-14.)   The Future is Yours to

24  Save is a non-existent tagline.  (*Id.* at 251:9-13.)  Dr. Amir did not provide any support

25  on the selection of his controls.

26    Dr. Amir's selection of the controls is not supported and is in contravention to

27  caselaw and treatises.  Moreover, experts in the field who testified at trial also rejected

28  Dr. Amir's use of his controls.  Both Dr. Simonson and Dr. Nowlis, relying on Shari

Diamond's treatise,[18] testified that a proper control should "share as many characteristics with the experimental stimulus as possible with the key exception of the characteristic whose influence is being assess." (Dkt. No. 349, Dr. Simonson Test. at 349:4-21; *see also* Dkt. No. 349, Dr. Nowlis Test. at 399:21-400:4.)  Dr. Nowlis testified that when he conducted a rebuttal survey on likelihood of confusion on this case, he selected "Better than a Bank" as his control explaining it was a perfect one because it followed the general rule that the control be similar as possible to the test stimulus but does not infringe.  (Dkt. No. 349, Dr. Nowlis Test. at 404:24-405:7.)  Thus, both Dr. Nowlis and Dr. Simonson, experts on market surveys, testified that Dr. Amir's controls were completely inadequate because they do not meet the criteria by failing to even use "bank" or "better" in his controls.  (*Id.* at 406:2-12.)  Therefore, caselaw, treatises and survey experts do not support Dr. Amir's use of control.

Further, SDCCU raises other issues that further reduce the value and reliability of Dr. Amir's survey results.  For example, Dr. Amir did not exclude any CEFCU members or employees from the survey.  (Dkt. No. 348, Dr. Amir Test. at 254:7-12.)  In fact, 365 of the 1073 survey respondents were CEFCU members.  (*Id.* at 254:13-15.)  Therefore, 34% of the respondents were already familiar with the tagline which most likely skewed the percentage of awareness.  Next, SDCCU avers that Dr. Amir did not change the order of his questions to avoid order effect.  (Dkt. No. 348, Dr. Amir Test. at 253:6- 254:6.)  He testified that he purposely did not change the order of the questions to make the results more conservative.  (*Id.* at 254:3-6.)  Yet, Dr. Simonson, relying on Dr. Shari Diamond's treatise in the Reference Manual on Scientific Evidence on question ordering, testified that Dr. Amir's failure to change the order of the questions caused an order effect by asking the same question in the same order which increased the tendency to guess.  (Dkt.

---

[18] Reference Guide on Survey Research in the Reference Manual on Scientific Evidence.

No. 349, Dr. Simonson Test. at 334:10-19; 335:1-19.)  Survey questions should be rotated to avoid order effect.  (*Id.*)

After consideration of the issues that plague Dr. Amir's survey, the Court assigns little or minimal weight on it for purposes of secondary meaning.  Because the evidence to support secondary meaning is limited to Dr. Amir's survey which has been given little weight and nonuse of the tagline by competitors, the Court concludes that CEFCU has not provided evidence to establish secondary meaning in the tagline, NOT A BANK. BETTER. where consumers or potential consumers in the greater Peoria area associate the tagline with CEFCU.

Therefore, because CEFCU has not established a valid and protectable interest in the tagline, NOT A BANK. BETTER. and, additionally, has not demonstrated its tagline is inherently distinctive or acquired secondary meaning, the Court finds in favor of SDCCU on the fourth declaratory judgment claim seeking invalidity of NOT A BANK. BETTER.

### Conclusion

Based on the above, judgment is entered in favor of Plaintiff SDCCU and against Defendant CEFCU on the declaratory judgment of invalidity of NOT A BANK. BETTER.  The Clerk of Court shall enter judgment accordingly.

IT IS SO ORDERED.

Dated:  May 25, 2021

Hon. Gonzalo P. Curiel
United States District Judge

18cv967-GPC(MSB)